**NORTON, Deputy Commissioner, v. VESTA COAL CO.**

**No. 4877.**

Circuit Court of Appeals, Third Circuit.
Jan. 26, 1933.

WOOLLEY, Circuit Judge, dissenting.

Z. L. Dalby, of Washington, D. C., and Louis E. Graham, U. S. Atty., and W. J. Aiken, Asst. U. S. Atty., both of Pittsburgh, Pa., for appellants.

William A. Challener and William A. Challener, Jr., both of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge.

The status of this case is thus stated by the court below:

"This is an equity suit by the plaintiff, Vesta Coal Company, against Augustus P. Norton, Deputy Commissioner of the United States Employees' Compensation of the 3rd District, in which the plaintiff is seeking to enjoin the enforcement of an award of compensation made to August J. Rahn, under the terms of the Longshoremen's & Harbor Workers' Compensation Act. The defendant has appeared and moved to dismiss the bill.

"The only question at issue under the facts set forth in the bill of complaint is whether or not the disability of Rahn resulted from an injury occurring 'upon the navigable waters of the United States (including any dry dock).' The bill discloses that on May 26, 1930, August J. Rahn was a pipefitter in the employ of the plaintiff-corporation, and was injured that date while removing a cylinder-head from an engine in the plaintiff's boat, the Steamer Warren Elsey, and that said injury was received while the Steamer Warren Elsey was not upon any navigable waters of the United States, or any dry dock; the boat had been entirely removed from the waters of the Monongahela River and was resting on the banks of said river, sustained and supported by pillars. The boat in question had been raised from the waters of the Monongahela River by a marine railway consisting of rails laid on a concrete foundation, which extended from the land into the water; cradles running on wheels were lowered down on these rails and placed under the boat in the water. The boat was then hauled up on these cradles by electric power to the dry land, the water running out of these cradles immediately, as they are open structures. After the boat was raised, the cradles were removed and the boat was blocked up. It appears that the boat was about seventy-five feet from the water's edge. The plaintiff contends that these marine ways on which the Steamer Warren Elsey rested at the time of the accident to Rahn, are not in any proper sense of the word a dry dock within the meaning of that term, as used in Section 902 (4), Section 903 (a) of [33 USCA sections 2 (4), 3 (a) of] the Longshoremen's & Harbor Workers' Act.

"Commissioner Norton has held that these marine railways were a dry dock within the meaning of the Act. If the injury occurred on dry land and was not while the ship was in dry dock, then the compensation laws of Pennsylvania would apply in the instant case; if the injury was a maritime injury within the meaning of this Act, then the state statute would provide no relief, and the Longshoremen's & Harbor Workers' Act would be in force."

That court, following Colonna's Shipyard v. Lowe, 22 F.(2d) 843 (where the vessel was still in the cradle and not, as here, removed from the cradle and supported on pillars), held the federal act does not apply in this case, and set aside the award. Thereupon the commissioner and the injured man took this appeal.

We here note the coal company is not seeking to avoid compensation to Rahn for

his injury, but contends such compensation should be under the Pennsylvania Workmen's Compensation Act (77 PS § 1 et seq.).

The controlling federal statute involved provides the term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock), and the contention is that Congress meant to include in the term "dry dock" a marine railway. We cannot make such assumption or speculation. We know clearly what in common speech a dry dock is. We also know what, in common speech, a marine railway is. In this regard see The Professor Morse (D. C.) 23 F. 803. While they are used for a like purpose, it by no means follows they are interchangeable terms. A contract to build, or rent, a dry dock would not be fulfilled in building a marine railway, and conversely, a contract to rent, or build, a marine railway would not be fulfilled by a dry dock. With these terms describing two different structures, it seems clear that, when Congress used the word "dry dock," it meant a dry dock in the common acceptation of the term, and did not intend to include any other thing. We rest on firm ground when we take Congress at its word. We enter into a field of speculation when we impute to Congress an intent to include something it did not say it included. The mention of one of a class is the exclusion of others. So regarding, the judgment below is affirmed.

WOOLLEY, Circuit Judge (dissenting).

I am constrained to dissent from the judgment of the court in the belief that, in order to understand the meaning of the statute and discern the intent of the Congress, its words should be read in the light of prior legislation on the subject.

Men, doing different kinds of work on and about ships at docks and in dry docks, sustained injuries of a character that brought them sometimes under state compensation acts; sometimes under maritime law, and at other times left them in doubt as to the law under which their injuries fell. In an endeavor to afford all these workmen of different classes complete and adequate redress, the Congress by the Act of October 6, 1917, 40 Stat. 395, and the Act of June 10, 1922, 42 Stat. 634, 28 USCA §§ 41 (3), 371, authorized states in certain cases to give relief under state workmen's compensation laws to workmen suffering injuries in maritime service. The Supreme Court regarded this legislation as an unauthorized attempt to delegate to states authority which was exclusively that of the United States in maritime matters, Washington v. W. C. Dawson & Co., 264 U. S. 219, 44 S. Ct. 302, 68 L. Ed. 646; Nogueira Case, 281 U. S. 128, 135, 50 S. Ct. 303, 74 L. Ed. 754, but intimated that the Congress might enact laws providing compensation for injuries to workmen when subject to federal jurisdiction. After this decision, rendered in 1924, the Congress, wanting a new law to cover injured workmen who could not be validly compensated under state laws, enacted the Longshoremen's and Harbor Workers' Compensation Act, U. S. Code, title 33, chapter 18, § 901 et seq. (33 USCA § 901 et seq.), patently intended to avoid the constitutional infirmities in the previous legislation and to extend compensation for injuries to workers when they are within the federal jurisdiction and when they cannot be compensated under state laws. Wheeling Corrugating Co. v. McManigal (C. C. A.) 41 F.(2d) 593, 595; Obrecht-Lynch Corp. v. Clark (D. C.) 30 F.(2d) 144.

The act defines the requisite federal jurisdiction as follows:

"Section 3. (a) Compensation shall be payable under this Act in respect to disability or death of an employee but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for disability or death through workmen's compensation proceedings may not validly be provided by state law." (33 USCA § 903 (a).

This is another way of saying that compensation can be awarded under the act only when the contract or work is maritime and the tort or injury is maritime, recognizing, no doubt, that jurisdiction of courts of admiralty in matters of contract depends on the maritime character of the contract and in torts on the maritime character of the place in which the torts were committed or the injuries occurred. North Pacific S. S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U. S. 119, 125, 39 S. Ct. 221, 63 L. Ed. 510; The Robert W. Parsons, 191 U. S. 17, 24 S. Ct. 8, 48 L. Ed. 73. As to the character of the contract or of the work of one who, when injured, was repairing a vessel hauled out on a marine railway, the North Pacific S. S. Co. Case is authority that it is maritime. The Alliance (D. C.) 236 F. 361. Indeed, all parties agree that the work of the injured man in this case—that of repairing a ship on a marine railway—was maritime and

to that extent satisfies the first jurisdictional requirement of the statute. But the question remains whether the "injury" was maritime. Ordinarily, the test of the maritime character of an injury, like that of a tort, is that the place where it occurred was upon navigable waters of the United States. But very plainly, and for a purpose which is obvious in view of the previous legislation, the statute under consideration does not limit the place of a maritime injury to navigable waters but extends it to "any dry dock."

Now there are several kinds of dry docks. One is a floating dry dock into which, through open gates, a vessel is moved and from which, when the gates have been closed, the water is withdrawn. The vessel then rests upon the bottom of the dry dock and the dry dock, in turn, floats upon the water. An injury in such a place, occurring in a "dry dock" and upon "navigable waters," would meet both phases of the statute.

Then there is the graven dry dock which is dug into the land and, though adjacent to navigable waters, cannot (being land) ever float upon them. It has gates at the water edge for the admission of water and of a vessel, and when water has entered and the vessel has followed, the gates are closed and the water pumped out. Thereafter the vessel rests upon the bottom of the dock and the bottom of the dock is land pure and simple. Thus the vessel is as effectively and as wholly removed from the water and placed upon the land as by a marine railway. It is not denied that the phrase of the statute "including any dry dock" includes a dry dock of the graven type. Butler v. Robbins Dry Dock & Repair Co., 240 N. Y. 23, 147 N. E. 235. But there are means other than floating and land locked dry docks for raising vessels, which to have their bottoms repaired must, of course, be lifted out of the water. In this case it is a marine railway which, as its name denotes, is a railway that begins in the water (necessarily navigable) and extends upward upon the fast land. Having a cradle under the water, a vessel moves above and finally rests upon it and the two are hauled out on land where maritime repairs are made. The question in this case is whether such a marine railway is a "dry dock" within the terms of the statute.

The pertinent term is "injury occurring upon * * * any dry dock." The meaning of this phrase is not a matter of speculation; it is, as I have indicated, a matter of judicial construction in the light of the legislative history of the subject.

Moreover, in viewing the subject as bearing on a marine railway, this court should be no more controlled by the dictionary definition of "dry dock" than was the Supreme Court controlled by definitions when it recognized that, in a given case, transportation by car floats and lighters constituted transportation by "railroad," United States v. Baltimore & O. R. Co., 231 U. S. 274, 288, 289, 34 S. Ct. 75, 58 L. Ed. 218, or when, in construing the word "commerce" in the commerce clause of the Constitution, it refused to limit the word to its commonly accepted meaning of traffic, i. e. buying and selling, saying, "This would restrict a general term, applicable to many objects, to one of its significations," and held that "commerce" means not only "traffic" but "intercourse," in that case by navigation. Gibbons v. Ogden, 9 Wheat. (22 U. S.) 1, 188, 6 L. Ed. 23.

I would construe the expression "any" dry dock to mean any "kind" of dry dock. The removal of the railway cradle from the water bearing the vessel is a maritime lift no different from that which occurs in the graven dock when the water is drawn off and the vessel is left standing high and dry. The vessel on the railway is as much, or as little, on navigable waters as the vessel in the graven dock, which, it should be kept in mind, is within the statute. In the first instance the vessel is withdrawn from the water and lifted upon the land; in the second instance the water is withdrawn from the dock and the boat left upon the land. In neither is it on navigable waters; in both it is on land. Thereafter, work on the vessel is in each case of the same maritime character, involving the same hazards and calling for the same compensation.

In these three types of docks there is no difference in purpose or use, or in their relation to maritime rights and obligations. All are concerned with maritime repairs. Each is an instrumentality in the same art. Their only difference is in the methods in which they function. When on a marine railway a vessel, licensed and engaged in commerce, is taken high on the land for repairs, there is no question that the contract of labor and the work done upon her at the time are maritime. North Pacific S. S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., supra. The work being maritime, though not done on navigable waters, it would seem that the Congress intended, within its scheme of legislation for relief of marine workers, that an injury occurring in maritime work should, when practicable, be considered maritime.

So, in framing the statute, it extended the jurisdiction of the admiralty courts beyond injuries occurring upon "navigable waters"—the old test—to injuries occurring "in any dry dock," and thus created a new maritime "place" within the second jurisdictional requirement.

The word "any" has significance; otherwise the Congress would not have used it. If the Congress did not know that dry docks are of different kinds or had thought that a dry dock always floats on water, it probably would have said "injury occurring upon navigable waters of the United States" including "a" dry dock; but, doubtless knowing that dry docks are of different kinds and that some float on navigable waters and others are not on navigable waters at all, it said "any" dry dock, indicating to my mind that it intended definitely to remove from the sphere of state compensation acts injuries resulting from work of a maritime character in places of a maritime character as it broadly defined them, and thereby intending to avoid possible conflict of jurisdiction between the federal government and state governments where work resulting in an injury is maritime yet the place, unless otherwise defined, might not be maritime.

Although the question whether, under the statute, the term "any dry dock" includes a marine railway is debatable, as shown by opposite decisions in Colonna's Shipyard v. Lowe (D. C.) 22 F.(2d) 843 and Continental Casualty Co. v. Lawson (D. C.) 2 F.Supp. (2d) 459, and by a permissible inference from the decision in North Pacific S. S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U. S. 119, 128, 39 S. Ct. 221, 63 L. Ed. 510, I am of opinion that the judgment below, on a finding that a marine railway is not included, should be reversed.